**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

**REGINA MURLEY,**

   **Plaintiff,**

**vs.**                                                          **No. CIV 12-668 JAP/CG**

**SOUTHEAST NEW MEXICO**
**COMMUNITY ACTION CORPORATION,**

   **Defendant.**

**MEMORANDUM OPINION AND ORDER**

Defendant, Southeast New Mexico Community Action Corporation ("Southeast"), filed a

MOTION FOR SUMMARY JUDGMENT (Doc. Nos. 33, 33-1–33-3) ("Motion for Summary

Judgment") contending that the evidence demonstrates that the *Faragher/Ellerth* affirmative

defense bars Plaintiff Regina Murley's claims of racial discrimination and hostile work

environment, that insufficient evidence supports Ms. Murley's claims of disparate treatment and

retaliation, and that Ms. Murley failed to exhaust her administrative remedies. Having considered

the record, the parties' briefs, and the relevant law, the Court concludes that Southeast's Motion

for Summary Judgment should be granted for the most part and that all of Ms. Murley's claims

should be dismissed, with the exception of her hostile work environment claim.

**FACTUAL BACKGROUND**

Ms. Murley does not dispute most of the facts presented by Southeast. This factual

background is derived from the undisputed facts, exhibits, and affidavits presented by the

parties. Nonetheless, in assessing the merits of Southeast's Motion for Summary Judgment, the

Court must view the facts in the light most favorable to Ms. Murley, the non-moving party. *See*

*Fuerschbach v. Sw. Airlines Co.*, 439 F.3d 1197, 1207 (10th Cir. 2006). Therefore, reasonable

1

inferences are drawn and factual ambiguities are resolved in Ms. Murley's favor.[1]

A.      **Ms. Murley's Job Background and Initial Problems With Mr. Echavarria**

Ms. Murley is a white, non-Hispanic female. *See* Charge of Discrimination, Plaintiff's

Exhibit D (Doc. No. 34-4) ("EEOC Charge"). Ms. Murley began working as Head Cook for

Southeast's Senior Citizen Program in Carlsbad and Artesia in December, 2009. *See* Position

Description, Defendant's Exhibit 3 (Docs. No. 33-5 at 7 and 33-6 at 1) ("Position Description").[2]

Around the time she began work, Ms. Murley signed an acknowledgment form indicating that

she had received a copy of Southeast's Human Resource Policy Handbook and that she agreed to

read it. Human Resources Policy Handbook Receipt Acknowledgment, Defendant's Exhibit 2

(Doc. No. 33-5 at 6) ("Handbook Acknowledgment"). Ms. Murley testified that she did receive

the Policy Handbook, but that no one ever told her she "needed to file a formal written complaint

in order to commence the investigation process." *See* Deposition of Regina Murley, Defendant's

Exhibit B (Docs. No. 33-9 at 6-8, 33-10) ("Murley Depo.") at 26:2-18. A written complaint is a

---

[1]Southeast argues that Ms. Murley did not "submit her own 'lettered' paragraphs of facts [or] refer particularly to the portions of the record supporting those facts in derogation of Rule 56.1(b)" of this District's Local Rules. DEFENDANT'S REPLY TO PLAINTIFF'S ANSWER TO MOTION FOR SUMMARY JUDGMENT (Doc. Nos. 35, 35-1) ("Reply") at 2. Southeast contends that Ms. Murley's "failure to comply with those rules provides grounds for this Court to deem all facts in favor of Defendant." *Id.* The Court declines to do so, and instead attempts to determine the undisputed facts from both parties' accounts as best it can. However, the Court admonishes Ms. Murley's counsel that in the future they must adhere to the requirements of local rules or risk jeopardizing their clients' cases on technical grounds.

[2]The Court pauses here to admonish Southeast's counsel that exhibits must be filed as individual, separate attachments, and that depositions and other material should have cover pages that include dates and other essential identifying information. Southeast's counsel filed its briefs and exhibits as continuous, sequential attachments that required the Court to refer back and forth to multiple docket numbers in order to reference even a single exhibit. This failure to properly separate exhibits, as well as the failure to provide dates and cover sheets, made this Court's task extremely arduous, and, should this case be appealed, will no doubt also cause difficulty for the Tenth Circuit.

requirement of Southeast's Problem Resolution Procedure ("PRP"), through which an employee can present concerns about harassment and other matters via a five-step process. *See* Southeast NM Community Action Corporation Handbook, Defendant's Exhibit 1 (Docs. No. 33-4 at 2-7, 33-5 at 1-5) ("Southeast Policy Handbook"), pages 50-50.1. Southeast's Policy Handbook also sets forth comprehensive anti-harassment and anti-retaliation guidelines, as well as a process for investigation of claims of discrimination, harassment, or retaliation and a reminder that it is the employee's responsibility to report "conduct they believe is contrary to" Southeast's policy against disparate treatment, harassment, discrimination, and retaliation. *Id.* at pages 25-28.

At Southeast, Ms. Murley was responsible for preparing food for approximately 350 people each day. *See* Murley Depo. at 132:19-24. Ms. Murley's job responsibilities included planning and following daily menus to prepare and serve food to the participants in the senior citizen program "in a manner that is consistent with federal, state, and local health regulations." *See* Position Description. Ms. Murley often felt shorthanded and unable to complete her work during regular working hours. *See* Murley Depo. at 238:18-239:1; October 2010 Performance Appraisal for Regina Murley, Defendant's Exhibit 6 (Doc. No. 33-6 at 4-6) ("Murley Perf. Appraisal"); Murley Aff. at 3. Southeast's policies did not permit Ms. Murley to work overtime or to do work at home, as she was not an "exempt" employee, and her supervisors did not make exceptions to enable her to do so. *See* Southeast Policy Handbook at page 69.

Soon after Ms. Murley began work at Southeast, her supervisor, Robert Echavarria, began to harass Ms. Murley by calling her by the wrong name; by commenting that the Mexican women working at Southeast should cook the Spanish rice because he felt that Ms. Murley, who is not Hispanic, did not cook it properly; and by sticking his finger in his mouth and pretending to gag over Ms. Murley's cooking. *See* Affidavit of Regina Murley, Plaintiff's Exhibit A (Doc.

3

No. 34-1) ("Murley Aff.); EEOC Charge; April 15, 2011 Letter from Dick Blenden, Plaintiff's

Exhibit E (Doc. No. 34-5) ("Blenden Letter"). Two of Ms. Murley's former co-workers also

observed this kind of behavior by Mr. Echavarria directed at Ms. Murley, though the time period

in which their observations took place is not clear. *See* Affidavit of Janice Pilkington, Plaintiff's

Exhibit B (Doc. No. 34-2) ("Pilkington Aff."); Affidavit of Ann Dominguez, Plaintiff's Exhibit

C (Doc. No. 34-3) ("Dominguez Aff."). Ms. Murley approached Caryle Goss,[3] who was Mr.

Echavarria's supervisor at the time, with her concerns, which Ms. Murley presented verbally to

Ms. Goss rather than through a written complaint. *See* Murley Aff. at 1. When Ms. Goss

"contacted [Mr. Echavarria] about it . . . that sort of harassment stopped." *Id.* Ms. Murley did not

file any kind of written complaint about Mr. Echavarria with Southeast at that time.

However, Ms. Goss left her job at Southeast in June 2010. *See id.* Misty Cryer succeeded

Ms. Goss as program director.[4] *See id.* Mr. Echavarria then resumed "the same sort of

harassment," and began additional forms of harassment: Mr. Echavarria started addressing Ms.

Murley by the derogatory term "*güera*;"[5] commenting negatively on Ms. Murley's weight; and

calling her "donkey ass" and "stupid." *Id.*; *see also* Pilkington Aff.; Dominguez Aff. (confirming

---

[3] In her affidavit, Ms. Murley spells Ms. Goss' name as "Carroll," but Ms. Goss' printed name on the Handbook Acknowledgment clearly shows that her first name is spelled "Caryle."

[4] In some of the affidavits and other materials, Ms. Cryer's name is spelled as "Misti." However, her signature on Southeast materials makes clear that its proper spelling is "Misty."

[5] On her EEOC Charge and elsewhere, Ms. Murley spelled *güera* phonetically as "wetta." The Court takes judicial notice that the term *güera* has a variety of translations including "whitey," "white girl," or "blondie," and that depending on the speaker and the person being spoken to, the term may have a derogatory connotation. *See Merriam-Webster Online*, http://www.merriam-webster.com/spanish/güero (last visited May 22, 2013); *The Urban Dictionary*, http://www.urbandictionary.com/define.php?term=guera (last visited May 22, 2013). In this case, Ms. Murley clearly subjectively felt that Mr. Echavarria used the term *güera* in a negative way in talking to her.

these observations). Additionally, "on two separate occasions, [Mr. Echavarria] picked up a knife in the kitchen and told [Ms. Murley] he was going to kill her," which understandably frightened Ms. Murley, to the point where she asked her husband to accompany her to the kitchen to see what was happening. Murley Aff. at 1; *see also* Pilkington Aff. (noting that she heard Mr. Echavarria say he would kill Ms. Murley), Dominguez Aff. (noting that she saw Mr. Echavarria hold a knife up to Ms. Murley and threaten to kill her). It is not clear exactly when these incidents took place, except that they occurred between June 2010 and April 2011. Ms. Murley claims that she "contacted Misty Cryer [with these concerns] and [Ms. Cryer] would do nothing but laugh about it and at one point said, maybe she should get boxing gloves for me and Robert. No corrective action was taken." Murley Aff. at 1; *see also* Murley Depo. at 69:7-12. Again, however, Ms. Murley did not file a written complaint or report about Mr. Echavarria's behavior, and because there is no record of Ms. Murley's conversations with Ms. Cryer, it is unclear exactly what Ms. Murley reported to Ms. Cryer, or when.

**B.     Ms. Murley's Counsel's Letter to Southeast and Southeast's Response**

By April 2011, Ms. Murley had engaged counsel. On April 15, 2011, her attorney, Dick Blenden, sent a letter to the Human Resources Director at Southeast. *See* Blenden Letter at 1. In the letter, Mr. Blenden noted the "slurs and epithets" that Mr. Echavarria used toward Ms. Murley, and contended that "[t]his is a continuous harassment and is in violation" of Southeast's Policy Handbook, as well as "a 'per se' violation of [Ms. Murley's] civil rights." *Id.* Mr. Blenden also charged that Mr. Echavarria was "not conducting himself in a proper fashion as an employee much less a supervisor," that he was "creating a discriminatory situation," and that "he is guilty of verbal bullying as set forth in" Southeast's Policy Handbook. *Id.* Mr. Blenden concluded by asserting that the "egregious situation" being experienced by Ms. Murley "must be stopped

5

immediately" because it was "a violation of the law for which [Ms. Murley] has substantial remedies." Blenden Letter at 2. Mr. Blenden also warned Southeast against any retaliation or further harassment, bullying, or discrimination by Mr. Echavarria. *See id*.

On April 19, 2011, after receiving Mr. Blenden's letter, Southeast placed Mr. Echavarria on paid investigatory leave for three days, and began investigating the allegations listed in Mr. Blenden's letter. *See* Corrective Action Document, Defendant's Exhibit 8 (Doc. No. 33-7 at 1-2) ("Echavarria CAD"). On May 3, 2011, after the investigation, Southeast issued a Corrective Action Document ("CAD") to Mr. Echavarria. *See id.* The CAD indicated that it constituted a "final warning" and that Mr. Echavarria would be placed on unpaid leave for three days for having violated three of Southeast's policies in its Policy Handbook through his "inappropriate verbal communication" and "inappropriate behavioral expression used toward an employee under your supervision." *Id.* The CAD specifically referred to Mr. Echavarria calling Ms. Murley "guera" [sic] and "burra,"[6] commenting on her weight, pretending to gag over her cooking, and saying that he was going to kill her. *See id.*

On May 9, 2011, after Mr. Echavarria returned from unpaid leave, Ms. Cryer issued a three-page Performance Improvement Plan ("PIP") to him. *See* Performance Improvement Plan, Defendant's Exhibit 9 (Doc. No. 33-7 at 3-5) ("Echavarria PIP"). The PIP explained that Mr. Echavarria was "expected to use words and mannerism [sic] that is [sic] appropriate for the workplace, addressing employee problems in private . . . . Comments that can be deemed as discriminatory or humiliating will not be tolerated." *Id.* The PIP also indicated that "[t]raining

---

[6]Though *burro* technically means "donkey" in Spanish, with *burra* as the feminine form of the word, the Court takes judicial notice that the word has a variety of informal meanings, mostly centered around the idea of someone being stupid.

regarding employment laws [would] be provided to [Mr. Echavarria] in the form of video

training on sexual harassment, other harassment, discrimination, and workplace violence." *Id.*

The PIP also focused on improving Mr. Echavarria's skills in appraising the performance of

employees he supervised, as well as in issuing corrective actions to those employees as needed.

*See id.* The PIP noted that Mr. Echavarria received training in 2007 and subsequent years on

communications, anger management, harassment, and managing diversity in the workplace,

among other topics. *See id.* The PIP placed Ms. Cryer, a white female, in charge of "[e]nsuring

the directives noted on PIP are carried out" and "monitoring supervisory skills closely with

regular feedback to ensure [Mr. Echavarria had] improved to expected standards." *Id.* Ms. Cryer

also became Ms. Murley's direct supervisor, rather than Mr. Echavarria. *See* Murley Depo. at

47:7-12. However, Ms. Murley points out that when he returned, Mr. Echavarria remained in his

old job, working in the kitchen where Ms. Murley worked. *See* Murley Aff. at 1.[7]

Mr. Echavarria provided a three-page response to the allegations against him.[8] *See*

Defendant's Exhibit 10 (Docs. No. 33-7 at 6, 33-8 at 1-2) ("Echavarria Response"). In it, he

denied that he ever acted disrespectfully toward Ms. Murley, used racial slurs toward her, or

pretended to gag over her food. *See id.* Mr. Echavarria blamed Ms. Murley at length for causing

problems in the kitchen and for not treating Mr. Echavarria with the respect he felt he deserved

---

[7]Southeast also claims that it "hired an employee mediator from New Mexico Junior College to help facilitate reconciliation between Plaintiff and Mr. Echavarria. Plaintiff and Mr. Echavarria attended that mediation on May 24, 2011." Motion for Summary Judgment at 4 ¶ 20. However, Southeast failed to point to any evidence in the record supporting this statement, so the Court cannot consider it as support for Southeast's Motion for Summary Judgment.

[8]Mr. Echavarria's response is untitled and undated, and it is impossible to tell whether it was written after the initial allegations against him arrived in Mr. Blenden's letter, after Mr. Echavarria received his CAD, or after Ms. Cryer issued the PIP.

while "tak[ing] advantage of" Mr. Echavarria having treated her "with kindness and respect."
*See id.* Mr. Echavarria provided a list of nine errors that Ms. Murley allegedly made in March
and April of 2011. *See id.* There is no evidence in the record of formal corrective action against
Ms. Murley for these alleged errors, though a later CAD issued to Ms. Murley confirms that Ms.
Murley received counseling during the same time frame as one of Mr. Echavarria's complaints
about her alleged errors. *See* Corrective Action Document, Defendant's Exhibit 12 (Doc. No. 33-
8 at 4-5) ("Murley CAD").

**C.    Ms. Murley's Problems at Southeast After Southeast's Response to Her Initial
         Allegations of Discrimination and Hostile Work Environment**

After Mr. Echavarria returned from his unpaid leave, he ceased making the kinds of
comments to Ms. Murley that he had made before. *See* Murley Aff. at 2; Murley Depo. at 30:12-
19, 45:12-16. However, Ms. Murley continued to have, or at least to perceive, problems with Mr.
Echavarria and others at Southeast. In particular, one day soon after Mr. Echavarria's return, Ms.
Murley tried to approach him about a work matter. Mr. Echavarria refused to speak with Ms.
Murley and instead silently flipped her off, pushing his glasses up on the bridge of his nose with
his middle finger for a period of three or four minutes. Murley Aff. at 2; Murley Depo. at 30:20-
31:11. This was a "frightening situation" for Ms. Murley. Murley Aff. at 2. However, Ms.
Murley did not report the incident to anyone at Southeast. Ms. Murley felt it was "no use to do
anything" since she believed that no one at Southeast was "going to do anything about it."
Murley Depo. at 31:12-15. Ms. Murley also sometimes heard Mr. Echavarria telling Helen
Lopez, a Hispanic female employee at Southeast, "how stupid [Ms. Murley] was" and that Ms.
Murley "couldn't cook." Murley Aff. at 2. Ms. Murley believed that Mr. Echavarria and Ms.
Lopez would leave messes in the kitchen after Ms. Murley left for the day. *See id.* Ms. Murley

came to this conclusion because she would clean the kitchen carefully before leaving for the day, but when she returned in the morning she would find water running, the fryer and grill left on, and surfaces dirtied, indicating that someone had prepared and eaten food in the kitchen. *See id.* Ms. Murley says that only Mr. Echavarria and Ms. Lopez also had keys to the office, "and therefore, I knew they were the ones doing that in order to cause me additional troubles." *Id.*

Ms. Murley says that when she tried to tell Misty Cryer about these new issues, Ms. Cryer "would do nothing." *Id.* Similarly, Ms. Murley believed that the stove and walk-in cooler box required repairs, but she "could get no one to [fix them], even though [Ms. Cryer and Mr. Echavarria] both knew it needed to be done." *Id.* Ms. Murley also seems to have felt that Ms. Cryer was harassing her because once when Ms. Murley had prepared some documents and left them in her filing cabinet, Ms. Cryer asked for those exact documents the next day. *Id.* at 3. Ms. Murley could not find the documents, and she believed she had purposefully been asked for "documents they knew I couldn't supply because they had been taken." *Id.*; *see also* Dominguez Aff. at 1. Similarly, in July 2011, Ms. Cryer apparently locked Ms. Murley out of Ms. Murley's computer files. *See id.* Ms. Murley says that Ms. Cryer said she did so because otherwise Ms. Murley "would mess up the computer," although Ms. Murley had used the computer for over a year without causing issues. *Id.* As with the earlier alleged harassment, Ms. Murley made no written report to Southeast about any of these issues or concerns that arose after her attorney's letter, and she provides no dates or other specific information about when the incidents occurred.

Ms. Murley continued to have issues with her workload and with some of the specific day-to-day job requirements at Southeast. In particular, on July 5, 2011, Ms. Cryer issued a CAD reprimanding Ms. Murley for not following the state-approved menu, after Ms. Cryer learned of the variance and investigated it herself. *See* Murley CAD; Misty Cryer Email Correspondence

9

with Tacy Farmer, Defendant's Exhibit 11 (Doc. No. 33-8 at 3) ("Cryer-Farmer Emails"). Ms. Murley refused to sign the CAD but did comment on the form that the reason she could not use the ingredient required by the menu was because her co-workers put most of the ingredient in another dish. *See* Murley CAD. Ms. Murley also claimed that she had called another Southeast employee to advise of the substitution. *See id.* That employee denied having received a call from Ms. Murley about the substitution. *See* Cryer-Farmer Emails. The CAD noted that Ms. Murley was previously counseled about similar concerns on three earlier dates, two of which occurred before Mr. Blenden's letter to Southeast. *See id.*

Soon after Ms. Murley received the CAD, on July 13, 2011, because of ongoing concerns about Ms. Murley's job performance, Ms. Cryer, Mr. Echavarria, and Southeast's executive director signed a PIP for Ms. Murley, outlining thirteen areas in which she was not performing well. *See* Performance Improvement Plan, Defendant's Exhibit 13 (Doc. No. 33-8 at 6-7, 33-9 at 1-2) ("Murley PIP"). Though the three supervisors who signed Ms. Murley's PIP seem to have discussed the issues listed in the PIP with her and heard part of Ms. Murley's side of the story, Ms. Murley refused to sign the PIP. *See id.* However, when Ms. Cryer and Mr. Echavarria later reviewed Ms. Murley's progress on addressing the issues listed in the PIP, Ms. Murley signed the review form, which indicated that she had improved in seven areas but still needed to work on another eight areas. *See* PIP Review for Regina Murley 7/18/11 through 8/5/11, Defendant's Exhibit 14 (Doc. No. 33-9 at 3) ("Murley PIP Review"). Ms. Murley signed the PIP Review because she agreed with its evaluation of her progress. *See* Murley Depo. at 282:18-22.

Ms. Murley believed that, in addition to the CAD she received for not properly requesting substitution of a menu ingredient, her supervisors at Southeast were "doing little things, adding to it, making the work load more and more and more" in the wake of the letter from her attorney to

10

Southeast and Southeast's subsequent investigation of Mr. Echavarria. Murley Depo. at 139:23-140:11. Ms. Murley felt that supervisors at Southeast "started blaming things on [Ms. Murley] that [she] wasn't doing." *Id.* at 141:3-7. But Southeast did not demote her or take other "tangible action" against Ms. Murley. *Id.* Ms. Murley also did not feel that the criticisms, such as those in the CAD, were "new" compared to what she had been told before about areas where she needed to improve her work. *See id.* at 139:19-140:17. Furthermore, Ms. Murley did not receive any particular extra tasks in the wake of the letter or investigation. *See id.*

On July 18, 2011, however, Ms. Murley filed a charge of discrimination with the Equal Employment Opportunities Commission ("EEOC"). *See* EEOC Charge. In the EEOC Charge, Ms. Murley checked a box marking that she believed she was being discriminated against on the basis of race, as well as one indicating that she believed that Southeast was retaliating against her. *See id.* Ms. Murley listed the date of the beginning of the discrimination as February 2, 2011, and indicated that it was a "continuing action." *Id.*[9] In the text box on the EEOC Charge form, Ms. Murley described the racial harassment she had experienced from Mr. Echavarria, Ms. Murley's attempts and failures to get help from Ms. Cryer, and the extra scrutiny and "nick picking" [sic] that Ms. Murley felt she was receiving from supervisors at Southeast after having complained about the harassment. *See id.* Ms. Murley did not check the box on the EEOC Charge form indicating that she believed she was being discriminated against on the basis of her sex, and in her narrative on the form she did not discuss sex discrimination.

---

[9]Someone hand-wrote "2/1/2010" below the typed date on the form. However, the earlier date is not initialed, and Ms. Murley's narrative description on the EEOC Charge refers to the later date. Additionally, as discussed below, February 1, 2010 is a date outside the presumptive bar set by statute for the time by which actions complaining of discrimination must be brought. Therefore, the Court will consider February 1, 2011, as the date reported to the EEOC as the beginning of the discrimination and hostile work environment.

**D.      Ms. Murley's Resignation From Her Job at Southeast**

At some point during the summer of 2011, Ms. Murley spoke with Ms. Cryer about whether Ms. Murley could work overtime or at home, because Ms. Murley felt she could not complete her work while at her work area. *See* Murley Depo. at 289:3-20. As noted, Ms. Murley had previously expressed her concern about being overworked and not having enough time during normal hours work hours to complete her job requirements. *See* Murley Performance Appraisal; Memo Dated September 21, 2010, Defendant's Exhibit 4 (Doc. No. 33-6 at 2) ("Cryer 2010 Memo"). Ms. Murley had been advised by her supervisors at Southeast at least once, in 2010, that she needed to avoid working overtime. *See* Murley Performance Appraisal.

When Ms. Murley approached Ms. Cryer in the summer of 2011, Ms. Murley apparently told Ms. Cryer that others at Southeast were either working overtime or doing work at their homes. *See* Murley Depo. at 289:3-20. It appears that Ms. Murley reported this to Ms. Cryer not because Ms. Murley wanted others to be punished, but because Ms. Murley also wanted to be able to work overtime or take work home. *See* Murley Aff. at 3. Instead, Ms. Cryer apparently determined that other people were breaking the rule against "nonexempt" employees working off the clock or off premises, and that Ms. Cryer needed to remind everyone of the rule. As a result, on August 23, 2011, Ms. Cryer included a memo with all Southeast employees' paychecks. *See* August 23, 2011 Memo by Misty Cryer, Defendant's Exhibit 15 (Doc. No. 33-9) ("Cryer Timekeeping Memo"). Ms. Cryer wrote that Southeast "does not support or permit non-exempt employees to work off of the clock on or away from the work area without advance written permission." *Id.* Ms. Cryer cited Southeast's Timekeeping Policy, which states that "nonexempt employee[s] will not be permitted to perform work away from the premises . . . unless approved in advance in writing by the Program Director." Southeast Policy Handbook at page 69.

When Ms. Murley received her paycheck on August 23, 2011, she saw the memo from Ms. Cryer. *See* Murley Aff. at 3. Though the memo was directed to "All Senior Citizens Program Staff," Ms. Murley believed that it was "directed at [her]." *Id*. Ms. Murley thought that the memo was part of "the harassment and the emotional abuse [she] had been taking." *Id.* The memo "pushed [her] over the edge and [she] could not take it any longer," so she resigned from Southeast on that day. *Id.* at 3-4. Ms. Murley recounted that on seeing the memo, she "snapped because [she] wasn't going to get any help" with all the work she had to do. Murley Depo. at 79:1-6. Ms. Murley believed she "needed the extra time to get caught up" because of the papers that had somehow gone missing when Ms. Cryer asked for them. *Id.* at 79:13-22. When Ms. Cryer confirmed in the memo of August 23, 2011, that Ms. Murley (like all other employees) could not work overtime to get caught up, Ms. Murley "was so upset knowing [she] was being pushed into termination" that she quit. Murley Aff. at 4. Ms. Murley contends that she "would not have quit [her] job had [she] not been so insulted, abused, referred to as stupid, threatened and failed to have any help from the supervisory office." *Id.* Ms. Murley did not amend her EEOC Charge at any time to include these later events or her resignation from Southeast.

## PROCEDURAL BACKGROUND

Ms. Murley received her Right-to-Sue Letter from the EEOC on March 23, 2012. *See* Doc. No. 1-1. On June 20, 2012, she filed her first COMPLAINT FOR DAMAGES (Doc. No. 1) ("First Complaint") in this Court within the required 90 days of receiving the Right-to-Sue Letter.[10] *See* Doc. No. 1. Thereafter, on June 22, 2012, Ms. Murley filed her FIRST AMENDED COMPLAINT

---

[10] "Title VII requires a plaintiff claiming employment discrimination to file a complaint within 90 days of receipt of a right-to-sue letter from the EEOC." *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 961 (10th Cir. 2012) (citing 42 U.S.C. § 2000e–5(f)(1)).

FOR DAMAGES (Doc. No. 4) ("Amended Complaint"), which appears to have been amended principally to correct a single clerical error in the Original Complaint, and to which the Court will refer throughout this MEMORANDUM ORDER AND OPINION. *See* Doc. No. 4.

The Amended Complaint lists five counts. Count I claims discrimination in violation of Title VII, 42 U.S.C. §§ 2000e-2, 2000e-3; Count II claims hostile work environment in violation of Title VII; Count III claims disparate treatment on the basis of race and sex in violation of Title VII; Count IV claims retaliation in violation of Title VII; and Count V claims "materially adverse employment action" in violation of Title VII. *Id.* Because both parties appear to read Count V as a claim for constructive discharge, the Court will also view it as such. *See* Motion for Summary Judgment at 2-4, Response at 7-9.

On March 27, 2013, Southeast filed its Motion for Summary Judgment, asking the Court to grant summary judgment to Southeast on all counts of the Amended Complaint. *See* Motion for Summary Judgment. On April 11, 2013, Ms. Murley filed an ANSWER TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 34) ("Response"). Finally, on April 16, 2013, Southeast replied to Ms. Murley's Response. *See* Reply (Doc. Nos. 35, 35-1). On April 29, 2013, Southeast filed a NOTICE OF COMPLETION OF BRIEFING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 36) ("Notice of Briefing Complete").

## LEGAL STANDARDS

**A.**     **Summary Judgment Standard**

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate "if the pleading, depositions, answer to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Medina v. Income*

14

*Support Div.*, 413 F.3d 1131, 1133 (10th Cir. 2005) (quoting Fed. R. Civ. P. 56©). At the summary judgment stage, evidence need not be submitted "in a form that would be admissible at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). For example, parties may submit affidavits in support of summary judgment, despite the fact that affidavits are often inadmissible at trial as hearsay, on the theory that the evidence may ultimately be presented at trial in an admissible form. *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). However, "the content or substance of the evidence must be admissible." *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 1995). Thus, when considering a motion for summary judgment courts should disregard inadmissible hearsay statements contained in affidavits, as those statements could not be presented at trial in any form. *See Hardy v. S.F. Phosphates Ltd. Co.*, 185 F.3d 1076, 1082 n. 5 (10th Cir. 1999). If the moving party meets the burden of showing that there is no genuine issue of material fact, the non-moving party must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith*, 475 U.S. 574, 587-88 (1986). The non-moving party may not rely upon the allegations in the pleadings, but must show at least an inference of the existence of each essential element of the case. *Eck v. Parke, Davis & Co.*, 236 F.3d 1013, 1016-17 (10th Cir. 2001) (citing *Husley v. K-Mart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994)).

When reviewing motions for summary judgment, the Court is mindful of three principles. First, the Court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Second, the Court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party. *See Hunt v. Cromartie*, 526 U.S. 541, 550-55 (1999). Third, the court cannot

15

decide any issues of credibility. *See Anderson*, 477 U.S. at 255; *see also Foster v. Alliedsignal, Inc.*, 293 F.3d 1187, 1195 (10th Cir. 2002) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."). In considering a motion for summary judgment, then, the Court's "role is simply to determine whether the evidence proffered by plaintiff would be sufficient, if believed by the ultimate factfinder, to sustain her claim." *Foster*, *supra*, at 1195.

## B.   Law on the *Faragher/Ellerth* Affirmative Defense to Title VII Claims

When an employee sues her employer for discrimination or a hostile work environment, rather than suing a supervisor who allegedly was discriminating against or harassing her, the employer may be able to assert an affirmative defense:

> First, the employer is vicariously liable when the supervisor's harassment culminates in a tangible employment act, such as discharge, demotion, or undesirable reassignment. In that situation, the employer has no affirmative defense available. Second, an employer may be vicariously liable for a hostile work environment, even absent a tangible employment action. However, in that circumstance, the employer will not be liable if it proves the following affirmative defense by a preponderance of the evidence: (1) it exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (2) the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1058-59 (10th Cir. 2009) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) and citing *Pa. State Police v. Suders*, 542 U.S. 129, 143-46 (2004); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998)) (internal citations and quotation marks omitted). The Supreme Court has held that constructive discharge may fall into the category of "tangible employment action." *See Suders*, 542 U.S. at 136-47. However, even in cases of constructive discharge, an "official act" or "tangible employment action" by the employer must "precipitate" the constructive discharge. *Id.* at 140-

41. Such qualifying "tangible employment actions," according to the Supreme Court, include "officially changing [the plaintiff's] employment status or situation, for example, a humiliating demotion, extreme cut in pay, or transfer to a position in which she would face unbearable working conditions." *Id.* at 134. When such an action or series of actions makes "working conditions so intolerable that a reasonable person would have felt compelled to resign," the *Faragher/Ellerth* defense is not available to the employer. *Id.* at 147 (citing *Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1160 (8th Cir. 1999); *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997)); *see also Hernandez*, 684 F.3d at 961 (reversing grant of summary judgment to employer on constructive discharge claim based on hostile working environment).

## DISCUSSION

### A.    Admissibility of Ms. Murley's Affidavit

Southeast contends that the Court should disregard Ms. Murley's affidavit because in it, she "seeks to contradict her sworn deposition testimony" in several areas on which she was cross-examined and gave clear answers in the deposition. Reply at 3-5. Southeast apparently argues, though it does not do so very clearly, that Ms. Murley's affidavit is "an attempt to create a 'sham fact issue'" under *Franks v. Nimmo.* 796 F.2d 1230 (10th Cir. 1986). In *Franks*, the Tenth Circuit outlined a test for assessing whether an affidavit should be admitted for summary judgment purposes, or whether it is a "sham" and should be stricken. *Id.* (quoting *Burns v. Bd. of Cnty. Comm'rs*, 330 F.3d 1275, 1282 (10th Cir. 2003) (application of the *Franks* test)). The factors a court is to consider under *Franks* are: "[1] whether the affiant was cross-examined during his earlier testimony, [2] whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and [3] whether the earlier testimony reflects confusion which the affidavit attempts to explain."

*Franks*, 796 F.2d at 1237 (citing *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1364-65 (8th Cir. 1983); *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)). Southeast argues that on at least the issues of (1) whether Mr. Echavarria continued harassing Ms. Murley or discriminating against her after Ms. Murley's counsel sent a letter to Southeast, and (2) Ms. Murley's reasons for quitting her employment at Southeast, Ms. Murley's affidavit fails the *Franks* test. *See* Reply at 3-4, 8, 10. Southeast contends that Ms. Murley was cross-examined during her deposition; she had access to the relevant evidence previously, so she was not producing her affidavit on the basis of new evidence; and the questions in the deposition were not confusing and her responses were unambiguous. *See id.*

Ms. Murley submitted the affidavit with her Response while taking the position that the affidavit alone "is sufficient to defeat the Motion for Summary Judgment for the reason that it does put in to evidence a disputing of the facts." Response at 2 (quoting *Payne v. Pauley*, 337 F.3d 767, 771, 773 (7th Cir. 2003) for the proposition that "a nonmoving party's own affidavit can constitute affirmative evidence to defeat a summary judgment motion" even if the affidavit is self-serving in its attempt to dispute material facts). In the Tenth Circuit, "[c]onclusory and self-serving affidavits are not sufficient" to defeat summary judgment. *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995) (quoting *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991)). In addition, *Franks* makes clear that if an affidavit contradicts clear deposition testimony without good reason for doing so (such as newly discovered evidence), courts should disregard the conflicting claims presented in the affidavit, and not use them to assess whether there are any disputes over material facts in the case. It is true that not all self-serving affidavits are entirely insufficient to defeat summary judgment, or that they are immediately excludable for trying to create issues of fact. Affidavits, like any other form of testimony that would be used at

18

trial, that are "based upon personal knowledge and [that] set forth facts that would be admissible in evidence," are acceptable to contest a motion for summary judgment; only if the affidavits are entirely "conclusory and self-serving" must they be scrutinized and possibly excluded. *Id.*

The Court finds that Ms. Murley's statement in her affidavit that the harassment by Mr. Echavarria continued after April 15, 2011, and her statement in her affidavit that she quit her job at Southeast because of harassment rather than being fed up with feeling overworked, are transparent attempts to create an issue of fact after clear deposition testimony to the contrary. Because these statements only create sham issues of fact, the Court will disregard them in its evaluation of whether genuine issues of material fact exist that preclude summary judgment. However, the remaining portions of Ms. Murley's affidavit generally address matters that are within her personal knowledge and experience, and that do not directly conflict with her deposition testimony, so the Court will not exclude those factual portions of the affidavit.

**B.** **Exhaustion of Ms. Murley's Administrative Claims**

Southeast argues that Ms. Murley's EEOC Charge "is limited to claims of discrimination based on 'race' between February and July of 2011 . . . [and] did not include allegations of sexual discrimination, disparate treatment, constructive discharge, or claims for discrimination prior to February 1, 2011[, . . .] each of those claims should be dismissed for failure to exhaust administrative remedies." Motion to Dismiss at 27. Additionally, because "[e]xhaustion of administrative remedies is a 'jurisdictional prerequisite' to suit under Title VII," the Court must assure itself that it may review the claims and incidents alleged by Ms. Murley. *Anderson v. Clovis Mun. Sch.*, 265 F. App'x 699, 706 (10th Cir. 2008) (not published) (quoting *Jones v. Runyon,* 91 F.3d 1398, 1399 (10th Cir. 1996)); *see also Shikles v. Sprint/United Mgmt. Co.*, 426 F.3d 1304, 1317 (10th Cir. 2005). Not only must a plaintiff fully exhaust her administrative

19

remedies before she may bring a Title VII suit in federal court, but also when she does bring suit, her claim then "is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC." *MacKenzie v. City & Cnty. of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005) (citations omitted).

Administrative exhaustion is central to the Title VII scheme because it gives EEOC the first opportunity to investigate unlawful practices and attempt to obtain voluntary compliance and conciliation. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 180-81 (1989); *Foster v. Ruhrpumpen, Inc.*, 365 F.3d 1191, 1195 (10th Cir. 2004); *Woodman v. Runyon*, 132 F.3d 1330, 1342 (10th Cir. 1997) ("The twofold purpose of the exhaustion requirement is to give notice of an alleged violation to the charged party and to give the administrative agency an opportunity to conciliate the claim in furtherance of Title VII's goal of securing voluntary compliance."). However, in lawsuits over workplace conditions, courts often utilize a "more lenient pleading standard [that] contemplates the fact that administrative charges of unlawful employment practices are regularly filled out by employees who do not have the benefit of counsel." *Mitchell v. City & Cnty. of Denver*, 112 Fed. App'x 662, 667 (10th Cir. 2005) (not published). But even under a more lenient standard, courts must avoid construing EEOC charges too liberally, since " 'allowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumvent the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge, as surely as would an initial failure to file a timely EEOC charge.'" *Welsh v. City of Shawnee*, 182 F.3d 934, 935 (10th Cir. 1999) (quoting *Schnellbaecher v. Baskin Clothing Co.*, 887 F.2d 124, 127 (7th Cir. 1989)). Courts must therefore not read into an EEOC complaint what the employee did not clearly allege or what would not logically follow from an investigation of the alleged violations.

20

As noted, Southeast argues that Ms. Murley's EEOC Charge failed to include her current claims of sex discrimination, disparate treatment, and constructive discharge, and that because she indicated on the EEOC Charge that the discrimination began on February 1, 2011, the Court may not consider any allegations of discrimination or harassment prior to that date. *See* Motion for Summary Judgment at 27. Specifically, Southeast contends, Ms. Murley's EEOC Charge "alleged only two types of illegal conduct: (1) Verbal acts of racial discrimination by Echavarria, and (2) retaliation by writing Plaintiff up and scrutinizing her work." Reply at 11. Southeast also argues that Ms. Murley's Response and affidavit "waived the only claims she exhausted" (i.e., for verbal discrimination and retaliation), because "[s]he admitted the 'verbal' abuse stopped. . . . [and] admitted she 'does not claim she was harassed for any mistakes she made as the cook.' " *Id.* at 12 (quoting Murley Aff. at 2; Response at 10). Ms. Murley responds mainly by contending that her EEOC Charge did in fact complain of everything now alleged in this case, as well as by noting the lenient pleading requirements. *See* Response at 11-12.

Both parties seem to misunderstand the underlying law and requirements of exhaustion. However, because the Court may not consider any claims that are not properly exhausted, for lack of jurisdiction, the Court will undertake its own examination of Ms. Murley's claims to determine whether they were properly exhausted. The Court will then proceed to assess the merits of only those claims that Ms. Murley exhausted.

### 1.      Timeliness: EEOC Exhaustion Bar Date

Before commencing a Title VII suit in a state with an agency empowered to investigate employment discrimination, like New Mexico's Department of Labor, Human Rights Division, "a plaintiff first must exhaust administrative remedies by filing a charge of discrimination with the EEOC within 300 days of the allegedly unlawful employment practice." *Castaldo v. Denver*

*Pub. Sch.*, 276 Fed. App'x. 839, 841 (10th Cir. 2008) (not published) (citing 42 U.S.C. §

2000e–5(e)(1); 42 U.S.C. § 12117(a); *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1206 n.3

(10th Cir. 2007) (explaining filing times in states that have their own agencies to investigate

unlawful employment practices). Each incident of discriminatory treatment constitutes its own

"unlawful employment practice," and a plaintiff must exhaust administrative remedies for each

incident. *Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003) (internal quotation marks and

citation omitted). Thus, "[i]n the context of suits based on discrete acts, a court may easily

determine whether the plaintiff filed a claim within the limitations period." *Tademy v. Union

Pac. Corp.,* 614 F.3d 1132, 1156 (10th Cir. 2008). In this context, discrete acts of discrimination

"occur on the day that [they] happen." *Id.* (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536

U.S. 101, 110 (2002)). By contrast, as discussed below, a claim of a hostile work environment

may encompass allegations of activities that were not properly exhausted, because hostile work

environment "claims do not consist primarily of discrete acts, but often involve a series of

incidents that span a period longer than 300 days." *Duncan v. Manager, Dep't of Safety, City &

Cnty. of Denver*, 397 F.3d 1300, 1308 (10th Cir. 2005). "[A]s long as 'an act' contributing to a

hostile work environment took place no more than 300 days before the plaintiff filed an EEOC

charge, a court may consider the complete history of acts comprising that hostile work

environment." *Id.* (quoting *Morgan*, 536 U.S. at 117).

   Ms. Murley filed her EEOC Charge on July 18, 2011. Subtracting 300 days from this

date, the Court reaches September 21, 2010. The Court lacks jurisdiction for discrete acts which

occurred before September 21, 2010, making that date the EEOC Exhaustion Bar Date. Ms.

Murley must also have alleged at least one act contributing to her hostile work environment that

occurred after September 21, 2010, the EEOC Exhaustion Bar Date, so that the Court has

22

jurisdiction over that claim. Because Ms. Murley's EEOC Charge stated that the conduct at issue

began on February 1, 2011, a date well within the EEOC Exhaustion Bar Date, timeliness is not

an issue in this case, except to the extent that discrete incidents of discrimination cited by Ms.

Murley in her affidavit occurred before February 1, 2011. However, any such incidents that are

not specifically cited in the EEOC Charge may not be considered by the Court in any case, for

lack of exhaustion, except with regard to the hostile work environment claim. Additionally,

because Ms. Murley did not amend her EEOC Charge after July 18, 2011, the Court cannot

consider any discrete conduct alleged to have occurred after that date.

      **2.**     **Claims that Ms. Murley Properly Exhausted**

          *a.*     *Racial Discrimination and Disparate Treatment Based on Race*

Ms. Murley's EEOC Charge points to two types of verbal comments made by Mr.

Echavarria as the racial harassment she experienced:

> (1) "Mr. Echavarria harasses me by making comments such as 'You cant
>
> [sic] cook Spanish rice, we have three Mexican girls here so let them
>
> cook.' "
>
> (2) "Mr. Echavarria also refers to me [as] 'Wetta' [*i.e., güera*] almost
>
> everyday."

With regard to Ms. Murley's claim of discrimination, then, these discrete incidents of

verbal harassment are the only ones that Ms. Murley specifically exhausted and over which the

Court has jurisdiction. Although Southeast argues that Ms. Murley did not exhaust her claim of

disparate treatment, the Court believes that under the principle of liberal construction of EEOC

claims, the EEOC would also have investigated disparate treatment based on race after reading

Ms. Murley's EEOC Charge. Therefore, the Court will consider that Ms. Murley also exhausted

the above incidents of racially colored comments and treatment by Mr. Echavarria for her claim of disparate treatment based on race.

>b.     *Retaliation*

Ms. Murley's EEOC Charge makes several claims regarding the retaliation that she believed she was experiencing at Southeast because of her complaint about discrimination, via her attorney's letter to Southeast on April 15, 2011.

>(1) "On or about July 5, 2011, Ms. Cryer and Mr. Echavarria wrote me up."

>(2) "Ms. Cryer started to scrutinize my work by trying to accusing [sic] me of giving wrong orders and 'nick picking' everything that I do creating a hostile work environment."

>(3) "Ms. Cryer and Mr. Echavarria told me they wrote me up for not doing inventory and for not giving out donations at Walmart. However, I have been doing my inventory and did give out donations at Walmart."

For the purposes of her retaliation claim, Ms. Murley properly exhausted these incidents through her EEOC Charge. The other actions that Ms. Murley discusses in her affidavit, such as Ms. Cryer locking Ms. Murley out of Ms. Murley's computer and someone taking necessary papers out of Ms. Murley's locker before she had a meeting about the papers with Ms. Cryer, were not mentioned in the EEOC Charge, if they even occurred before Ms. Murley filed the EEOC Charge, and therefore the Court may not consider those incidents in its evaluation of the merits of Ms. Murley's retaliation claim.

>c.     *Hostile Work Environment*

Ms. Murley's hostile work environment claim is based on the same actions cited above for her racial discrimination and retaliation claims—that is, derogatory, racially-tinged verbal

comments by Mr. Echavarria, and heightened scrutiny and allegedly unfair or erroneous write-ups and accusations by Mr. Echavarria and Ms. Cryer after Ms. Murley's attorney sent a letter to Southeast complaining of the harassment. Because these incidents occurred within the period over which the Court has jurisdiction, and were properly exhausted, the Court may also consider incidents contributing to a hostile work environment that occurred before or after Ms. Murley filed her EEOC Charge, and were not properly exhausted. *See Duncan*, 397 F.3d at 1309-10. The Court also notes that not all incidents contributing to a hostile work environment must be based on race. This is because the Tenth Circuit has "long held that '[f]acially neutral abusive conduct can support a finding of [racial] animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly [racially]-discriminatory conduct.' " *Hernandez*, 684 F.3d at 960 (quoting *O'Shea v. Yellow Tech. Servs.*, 185 F.3d 1093 at 1097 (10th Cir. 1999); *Penry v. Fed. Home Loan Bank of Topeka,* 155 F.3d 1257, 1263 (10th Cir. 1998). Because some of Mr. Echavarria's comments to Ms. Murley had overtly hostile racial content, the Court may consider incidents cited by Ms. Murley that are facially neutral as to race in considering her hostile work environment claim.

However, to consider such additional incidents, the Court must also first "define the scope of the alleged hostile work environment. . . . by examining the acts in the filing period and determining what acts outside of the filing period are related by type, frequency, and perpetrator." *Duncan*, 397 F.3d at 1309. Incidents that may have occurred before the EEOC Exhaustion Bar Date[11] include Mr. Echavarria calling Ms. Murley by the wrong name; pretending to gag over her

---

[11]As noted, because Ms. Murley failed to include almost any relevant dates in either her Amended Complaint or her affidavit, the Court is not able to determine with certainty whether these incidents occurred before or within the EEOC Exhaustion Bar Date.

food; insulting her weight and intelligence with crude comments; and threatening to kill her while brandishing a knife on two occasions. *See* Murley Aff. at 2. Incidents that may have occurred after the EEOC Exhaustion Bar Date include Mr. Echavarria flipping Ms. Murley off; Mr. Echavarria and Ms. Lopez leaving the kitchen dirty after Ms. Murley had cleaned it; Ms. Cryer locking Ms. Murley out of Ms. Murley's computer; Ms. Cryer not helping Ms. Murley with Ms. Murley's complaints about Mr. Echavarria; and Ms. Cryer and Mr. Echavarria not having the kitchen stove repaired. *See id.*

The Court finds that of these additional incidents, the Court may consider most of the incidents that involved Mr. Echavarria as being reasonably related to the incidents exhausted in Ms. Murley's EEOC Charge and contributing to the same hostile work environment. In the EEOC Charge, Ms. Murley mentioned that Mr. Echavarria called her names and criticized her cooking. The other, non-exhausted incidents—Mr. Echavarria's juvenile behavior in calling Ms. Murley the wrong name, criticizing her cooking, weight, and intellect—are largely of the same type, by the same perpetrator, and, though it is not terribly clear from Ms. Murley's response or affidavit, appear to have happened with some frequency. And although Mr. Echavarria's threats to kill Ms. Murley while brandishing a knife are of a somewhat different, and much more serious, type, they are not so different from his other boorish play-acting (e.g., pretending to gag over her food) for the Court to refuse to consider them as part of the same hostile work environment, though they happened much less frequently.

On the other hand, the incidents involving Ms. Cryer that took place outside the EEOC Exhaustion Bar Date appear very different to the Court in terms of all the factors mentioned by the Tenth Circuit in *Duncan*. *See* 397 F.3d at 1309. The events involving Ms. Cryer that Ms. Murley included in the EEOC Charge mostly revolved around Ms. Cryer allegedly retaliating

against Ms. Murley by increasingly scrutinizing Ms. Murley. The incident involving the stove complaints, Ms. Cryer's alleged failure to help Ms. Murley with Mr. Echavarria, and Ms. Cryer locking Ms. Murley out of Ms. Murley's computer are very different in type and apparent frequency, and the Court will not consider them as contributing to the same hostile work environment as the increased scrutiny alleged in, and exhausted by, Ms. Murley's EEOC Charge.

### 3. Ms. Murley Did Not Exhaust Her Claims of Sex Discrimination and Constructive Discharge

Ms. Murley did not indicate on her EEOC Charge that she was experiencing sex-based discrimination at Southeast. Ms. Murley also never, in the letter sent to Southeast by her counsel, in her Complaint, in her deposition, or in any pleadings, made any reference to behavior by Mr. Echavarria or others at Southeast that could be reasonably construed as sexual harassment or discrimination. Indeed, Ms. Murley clearly *denied* in her deposition that she was harassed or discriminated against in any other way than racially. *See* Murley Depo. at 8:2-22.[12] Ms. Murley asks the Court to "liberally construe what was said in the EEOC complaint," but even though the Court does so, it is impossible to read sex discrimination into a complaint such as Ms. Murley's EEOC Charge that is solely about racial discrimination. *See* Response at 12. The EEOC form is simple; Ms. Murley could easily have checked the box labeled "sex" under "Discrimination

---

[12]Although the deposition questioning is confusingly and awkwardly worded, Ms. Murley's responses are nonetheless clear and unambiguous:
"Q. ". . . [A]nd on what characteristic do you think [Robert Echavarria] discriminated against you on?
A. Race.
. . . .
Q. Is there another characteristic that you think you were discriminated—for instance, your hair color or eye color or something else you could tell, for instance, he treated someone who was that same type or a different type differently than he treated you so that it led you to believe that characteristic was the reason for the discrimination.
A. No, sir. I believe it was my Race." Murley Depo. at 8:2-22.

Based On," if she believed that she was subject to discrimination or harassment because of her sex. *See* EEOC Charge. Similarly, Ms. Murley's narrative description in the EEOC Charge of the claimed harassment's particulars cannot reasonably be read to allege sexual harassment. *See id.* ("I have been subjected to racial harassment . . . [via Mr. Echavarria's] comments such as 'You cant [sic] cook Spanish rice' . . . . I believe that I have been discriminated against because of my race, White, in violation of Title VII. . . ."). "The failure to mark a particular box [on the EEOC complaint form] creates a presumption that the charging party is not asserting claims represented by that box." *Jones v. United Parcel Serv., Inc.*, 502 F.3d 1176, 1186 (10th Cir. 2007) (citing *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1260 (10th Cir. 1998)). "The presumption may be rebutted, however, if the text of the charge clearly sets forth the basis of the claim." *Jones v. United Parcel Serv., Inc.*, 502 F.3d at 1186. As noted, the text of Ms. Murley's EEOC Charge fails to rebut the presumption that she was not making a claim of sex-based harassment or discrimination, because nothing in the text would lead the EEOC to think that she was making any claim of sex discrimination that it might need to investigate.

Since "failure to exhaust administrative remedies is a bar to subject matter jurisdiction, the burden is on the plaintiff as the party seeking federal jurisdiction to show, by competent evidence, that she did exhaust." *McBride v. Citgo Petroleum Corp.*, 281 F.3d 1099, 1106 (10th Cir. 2002). Ms. Murley argues that she "[o]bviously . . . submitted every one of her charges to the EEOC that have been alleged in her complaint." Response at 12. However, even her own present description of the EEOC Charge makes it clear that the EEOC Charge did not allege much of what the Amended Complaint alleges. Ms. Murley avers that the EEOC Charge contained allegations of "[1] Racial harassment and adverse terms and conditions of employment [; 2] The Defendant created a hostile work environment by Robert Echavarria and Misty Cryer [; 3] Discrimination

28

because of her race[; 4] Retaliation in paragraph III [of the EEOC Charge]." As discussed above, the Court agrees that the EEOC Charge alleged these things. But even by this account by Ms. Murley, the EEOC Charge includes no claim of sex discrimination, or, as noted below, constructive discharge. The Court would be expanding the principle of liberal construction too far if it were to read allegations of sexual harassment into Ms. Murley's EEOC Charge or even her present filings, none of which, not even her own affidavit, refer to a perception by Ms. Murley that she was being harassed or discriminated against because of her sex.

Because Ms. Murley has plainly not exhausted her claim of sex discrimination, and did not even vaguely put the EEOC or Southeast on notice that she believed she was subject to sexual harassment or discrimination, the Court does not have jurisdiction over the portion of Ms. Murley's claim in Count III of the Amended Complaint that alleges sex discrimination and "disparate treatment . . . because of her . . . sex." Furthermore, to the extent that Counts I and II attempt to allege sex discrimination, the Court also lacks jurisdiction over those components of the claim. Therefore, Ms. Murley's claims of sex discrimination will be dismissed without prejudice. *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1216 (10th Cir. 2006) ("A longstanding line of cases from this circuit holds that where the district court dismisses an action for lack of jurisdiction, . . . the dismissal must be without prejudice.").

Similarly, Ms. Murley did not exhaust her claim in Count V of constructive discharge. As noted, she never amended her EEOC Charge after she resigned from Southeast. Therefore, the EEOC never had notice of any claim based on her resignation. The Court lacks jurisdiction over Ms. Murley's constructive discharge claim because she failed to exhaust it, and therefore the Court will dismiss Count V of the Amended Complaint without prejudice.

29

**C.**     **Ms. Murley's Failure to Respond to Southeast's Briefing on the Retaliation and Disparate Treatment Claims Justifies Summary Judgment On Those Claims**

Southeast correctly points out that Ms. Murley failed to address in any way Southeast's

briefing on the Motion for Summary Judgment of her retaliation and disparate treatment claims.

*See* Reply at 10. Under local rules of court procedure, Ms. Murley's failure to file a response

opposing the motion to dismiss or for summary judgment is deemed to be consent to the granting

of the motion. *See* D.N.M. LR-Civ 7.1(b). However, the Tenth Circuit has held that despite such

local rules, summary judgment on an issue is not proper even if the non-moving party has not

responded, unless the moving party has carried its own burden. *See Murray v. City of Tahlequah,*

*Okla.*, 312 F.3d 1196, 1200 (10th Cir. 2002) ("Before the burden shifts to the nonmoving party

to demonstrate a genuine issue, the moving party must meet its 'initial responsibility' of

demonstrating that no genuine issue of material fact exists and that it is entitled to summary

judgment as a matter of law.") (quoting *Celotex*, 477 U.S. at 323; Fed. R. Civ. P. 56(e)).

Having reviewed the motion and the supporting memorandum including its exhibits, the

Court concludes that Southeast has carried its initial burden of demonstrating both that no

genuine issue of material fact exists and that summary judgment on the issues of disparate

treatment and retaliation is warranted. For Ms. Murley's racial disparate treatment claim in

Count III, Southeast argues that Ms. Murley did not meet her "initial burden of establishing a

prima facie case of racial discrimination by showing (1) that [she] is a member of a racial

minority, (2) that [she] suffered an adverse employment action, and (3) that similarly situated

employees were treated differently." *See* Motion for Summary Judgment at 23-24; *Trujillo v.*

*Univ. of Colo. Health Sci. Ctr.*, 157 F.3d 1211, 125 (10th Cir. 1998) (citing *McDonnell Douglas*

*Corp. v. Green,* 411 U.S. 792, 802 (1973)). The Court agrees that Ms. Murley has not provided

evidence of either an adverse employment action, as defined in the case law, or of different treatment of similarly situated employees. "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions . . . would form the basis of a discrimination suit." *MacKenzie*, 414 F.3d at 1279; *see also Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 857 (10th Cir. 2000) (explaining that Title VII only proscribes discriminatory conduct by employers that "alters the employee's compensation, terms, conditions, or privileges of employment, or adversely affects his [or her] status as an employee."). "Only acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits will rise to the level of an adverse employment action." *Robinson v. Cavalry Portfolio Serv., LLC*, 365 Fed. App'x. 104, 114 (10th Cir. 2010) (not published) (quoting *Haynes v. Level 3 Commc'ns.*, 456 F.3d at 1218-19).

Though Ms. Murley mentions actions by her supervisors at Southeast that she appears to believe were "adverse," such as somewhat increased scrutiny by Ms. Cryer, Ms. Cryer's and Mr. Echavarria's refusal to have the stove repaired, Ms. Cryer's locking Ms. Murley out of Ms. Murley's computer, and Ms. Cryer's memo to employees about the rule against working overtime or off premises, none of these actions qualify as "materially adverse." *See* Murley Aff. at 2-3. Ms. Murley admitted in her deposition that she never received any particular new tasks, and although she claimed that her supervisors "started doing little things, adding to [her work], making the work load more and more and more," she provided no further evidence or concrete claim of any such increase. *See* Murley Depo. at 140:9-17. Ms. Murley's claims do not appear to rise above the level of "minor and even trivial employment actions" that cannot properly form

the basis of a Title VII suit. *MacKenzie*, 414 F.3d at 1279. Ms. Murley has also provided no evidence about the treatment of any other employee at Southeast, except for a vague statement by Anna Dominguez that "now that [Ms. Murley] is gone, I'm allowed to stay over along with Cecilia Ruiz and we are allowed to do things in the kitchen to help that we were never allowed to do with [Ms. Murley]." Dominguez Aff. at 2. This single statement provides no basis for the Court to assess differing treatment of employees. Therefore, the Court finds that Ms. Murley has also failed to show that any other similarly situated employee was treated differently than she was on the basis of race. Because Southeast has demonstrated that Ms. Murley has not proven a prima facie case of disparate treatment, Southeast has fulfilled its "initial responsibility" on that claim and summary judgment in Southeast's favor is merited.

Southeast similarly argues that Ms. Murley cannot prove a prima facie case of retaliation. *See* Motion for Summary Judgment at 15. For retaliation claims, a plaintiff must demonstrate that " (1) she engaged in protected opposition to discrimination; (2) [the employer] took an adverse employment action against her; and (3) there exists a causal connection between the protected activity and the adverse action." *Stover v. Martinez*, 382 F.3d 1064, 1071 (10th Cir. 2004) (citing *Jones v. Barnhart,* 349 F.3d 1260, 1269 (10th Cir. 2003); *Kendrick v. Penske Trans. Servs, Inc.,* 220 F.3d 1220, 1234 (10th Cir. 2000)). Southeast contends once again that Ms. Murley fails in her claim that Southeast took "adverse employment action" against her. *See* Motion for Summary Judgment at 16. Southeast points out that Ms. Murley's "list of retaliatory acts amounts to no more than speculation and claims of general lack of civility." *Id*. (citing *Somoza v. Univ. of Denver*, 513 F.3d 1206 (10th Cir. 2008); *Duncan*, 297 F.3d at 1314).

As discussed above, the Court agrees that Ms. Murley has clearly not demonstrated that Southeast or her supervisors took an "adverse employment action" against her, as is required for

a prima facie case of retaliation. Southeast also argues that "[e]ven if Ms. Murley had made a prima facie case for retaliation, she cannot establish pretext on the part of [Southeast]," as required under the *McDonnell Douglas* burden-shifting test. Motion for Summary Judgment at 19. As Southeast notes, Southeast has provided ample evidence that Ms. Murley's supervisors had reason for complaint about Ms. Murley's performance both before and after Ms. Murley's attorney complained about Mr. Echavarria. *See id.* (quoting *Bertsch v. Overstock.com*, 684 F.3d 1023, 1029 (10th Cir. 2012) for the proposition that "poor performance . . . is the quintessential nondiscriminatory reason [for adverse action]."). Southeast has provided evidence that on numerous occasions prior to Ms. Murley's complaints, her supervisors were concerned about her work. *See* Murley CAD (noting prior dates of counseling). Indeed, Ms. Murley does not deny that she made some mistakes, and she acknowledged that it was vital to Southeast's funding that she follow the required menu exactly, in a way that she was not doing. *See* Murley Depo. at 144; 234-38. Though Southeast's showing on the issue of pretext is not overwhelming, given the Court's conclusion that Ms. Murley did not experience an adverse employment action in the first place, and the fact that Ms. Murley did not respond to Southeast's briefing to explain how Southeast's explanation is pretextual, the Court concludes that on the issue of retaliation, too, Southeast has carried its initial burden and that summary judgment is justified.

Southeast is also entitled to the granting of its Motion for Summary Judgment as an appropriate sanction under *Meade v. Grubbs*, 841 F.2d 1512 (10th Cir. 1988). The Court makes the following findings in accordance with *Meade*:

1. Southeast has been prejudiced by Ms. Murley's failure to respond to portions of its Motion for Summary Judgment addressing retaliation and disparate treatment, because Southeast incurred the expense of researching and addressing those portions of Ms.

Murley's claim in the Motion for Summary Judgment and supporting brief;

2.  Ms. Murley has interfered with the judicial process, first by not filing a complete response in opposition to the Motion for Summary Judgment within the time permitted by the rules of this Court, and second by failing to file a complete response at any time to date; and

3. Ms. Murley has provided no explanation, whatsoever, for her failure to file a complete response to the Motion for Summary Judgment which was filed approximately eight weeks ago.

These aggravating factors outweigh the normal predisposition to resolve claims on their merits and justify the Court's decision to grant summary judgment to Southeast on Ms. Murley's retaliation and disparate treatment claims as an appropriate sanction. The Court will therefore grant Southeast's Motion for Summary Judgment on the basis of Ms. Murley's deemed consent, on the merits, and as a sanction for Ms. Murley's failure to prosecute her claims of retaliation and disparate treatment against Southeast.

**D.**     **Southeast Is Entitled to the Protection of the *Faragher/Ellerth* Defense on Ms. Murley's Racial Discrimination Claim**

Having disposed of three of the counts in Ms. Murley's Amended Complaint, the Court turns to the remaining two counts, beginning with Ms. Murley's claim of racial discrimination. To begin with, the Court notes that neither Southeast nor Ms. Murley addresses the issue of whether Ms. Murley has adequately alleged discrimination under Title VII. Normally, the Court assesses discrimination claims that do not present direct evidence of discrimination under the familiar *McDonnell Douglas* burden-shifting framework. *See* 411 U.S. 792; *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002). First, a Title VII plaintiff must present a

prima facie case of discrimination by showing that "(1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) she qualified for the position at issue, and (4) she was treated less favorably than others not in the protected class." *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012) (citing *Sanchez v. Denver Pub. Sch.,* 164 F.3d 527, 531 (10th Cir. 1998)). Next, the defendant must "produce a legitimate, non-discriminatory reason for the adverse employment action. If the defendant does so, the burden then shifts back to the plaintiff to show that the plaintiff's protected status was a determinative factor in the employment decision or that the employer's explanation is pretext." *Khalik*, 671 F.3d 1188, 1192 (10th Cir. 2012) (citing *Garrett,* 305 F.3d at 1216). Importantly, "[a] plaintiff may satisfy the third prong [of the *McDonnell Douglas* test] by demonstrating that he was constructively discharged." *Baca v. Sklar,* 398 F.3d 1210, 1216 (10th Cir. 2005). " 'Constructive discharge occurs when the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign. Essentially, a plaintiff must show that she had *no other choice* but to quit.' " *Sandoval v. City of Boulder*, 388 F.3d 1312, 1325 (10th Cir. 2004) (emphasis in original) (quoting *Sanchez,* 164 F.3d at 534).

In this case, neither Southeast nor Ms. Murley makes any argument about the merits of Ms. Murley's prima facie claim of discrimination, about whether Southeast presented properly non-discriminatory reasons for its actions, or about whether Ms. Murley can show pretext underlying those proffered reasons. Rather, Southeast's briefing jumps at the very outset to an

argument that Southeast is protected by the *Faragher/Ellerth* defense.[13] Because the Court will not make the parties' arguments for them, the Court will therefore only address the merits of Southeast's claim that it can successfully assert the *Faragher/Ellerth* defense in response to Ms. Murley's claim of discrimination, rather than assessing the merits of the claim itself.

### 1.     No "Official Act" By Southeast Precipitated Ms. Murley's Resignation

Southeast argues that, in the first place, it "took no 'tangible employment action' " against Ms. Murley, and that as a result, "the *Faragher/Ellerth* affirmative defense applies." Motion for Summary Judgment at 10. Next, Southeast argues that it had reasonable policies and procedures in place to prevent harassment, that it "immediately conducted an investigation and took corrective action," causing the discrimination to cease, and that Ms. Murley's failure to submit any further written complaints after her attorney's April 15, 2011 letter precludes any recovery because of the *Faragher/Ellerth* framework requirements. *Id.* at 10-14. Southeast contends that these factors enable it to successfully assert the *Faragher/Ellerth* defense.

Ms. Murley responds by contending that Southeast was in fact responsible for a "tangible employment action" because of Ms. Murley's alleged constructive discharge, and that the *Faragher/Ellerth* defense is unavailable to Southeast "because two supervisors' official acts precipitated the constructive discharge." Response at 9. Ms. Murley identifies Mr. Echavarria and Ms. Cryer as the two supervisors, but the only act by Southeast that Ms. Murley refers to is

---

[13]As discussed below, Southeast explicitly says it does not contest, for the purposes of the Motion for Summary Judgment, "that Mr. Echavarria created a hostile work environment prior to April 15, 2011." Motion for Summary Judgment at 8-9. Southeast makes no similar statement with regard to Ms. Murley's claim of discrimination; as noted, however, Southeast also does not make arguments contesting her evidence of discrimination. Therefore, the Court will treat Ms. Murley's claim of discrimination in the same manner as her hostile work environment claim, as being established for the purposes of the Motion for Summary Judgment, in order to assess whether Southeast has properly asserted the *Faragher/Ellerth* defense.

Ms. Cryer's August 23, 2011 note to employees about not working overtime or off the premises if they were not exempt. *See id*. at 7. The Court disagrees that Ms. Cryer's memo was the kind of "official act" contemplated by the Supreme Court in *Suders*. Despite Ms. Murley's subjective belief that the memo "was directed at [her]" and that she was being "singled out," Ms. Cryer's note and its references to Southeast's Timekeeping Policy make it clear that the rule applied to all employees. *See id.*; Cryer Timekeeping Memo; Southeast Policy Handbook at page 69. Ms. Murley may have felt that the memo was directed at her because of her conversation with Ms. Cryer about whether Ms. Murley could do work at home, but the plain import of Ms. Cryer's memo and Southeast's Timekeeping Policy is that they applied to *all* "non-exempt" employees. *See* Cryer Timekeeping Memo; Southeast Policy Handbook at page 69.

Even if one could characterize Ms. Cryer's memo as an "official act," the memo was plainly not directed at Ms. Murley, and did not change the terms or conditions of Ms. Murley's employment. Rather, Ms. Cryer's memo upset Ms. Murley because the memo confirmed a pre-existing rule, applicable to all non-exempt employees, against work at home. Ms. Murley quit because she "could not take it" when she realized that she would not be able to do work at home. Murley Aff. at 3. As Southeast argues, the circumstances surrounding Ms. Murley's decision to quit resemble those in a recent Tenth Circuit case. *See* Reply at 6 (citing *Chapman v. Carmike Cinemas*, 307 Fed. App'x 164, 169 (2009) (not published)). In *Chapman*, the Tenth Circuit held that because the plaintiff "attribute[d] her resignation to her psychological state, in turn attributed to the assault, rather than to an official act by [the defendant]," the defendant was not precluded from asserting the *Faragher/Ellerth* defense.

Although Ms. Murley attempts to attribute her resignation to Ms. Cryer's memo, Ms. Murley's deposition testimony makes it clear the real reason for her resignation was her ongoing

frustration with her work environment and perception that she was being overworked— that is, it was her "psychological state," as in *Chapman*. *See* Murley Depo. at 78-79. Ms. Murley may have "snapped" and decided to resign upon receiving Ms. Cryer's memo, but that does not make the memo the precipitating official act required by the Supreme Court. *Id.* at 79. Rather, as Ms. Murley acknowledges, she resigned because she "could not take" what she felt was the excessive workload and the "abuse [she] had been taking" at Southeast. Murley Aff. at 3. Because of this psychological burden, she resigned when Ms. Cryer's memo confirmed to her that she would not be able to get any special help, at least for the extra work she had. *See id.* Therefore, following the Tenth Circuit's guidance in *Chapman*, the Court finds that no official act by Southeast precipitated Ms. Murley's resignation, and that Southeast therefore may assert the defense as to Ms. Murley's claim of racial discrimination.

### 2.    Southeast's Actions In Disciplining Mr. Echavarria Were Reasonably Calculated to Prevent Further Racial Harassment

Although Southeast may assert the *Faragher/Ellerth* defense, the Court still must judge whether Southeast has proven the defense's required elements. First, Southeast must show that it "exercised reasonable care to prevent and correct promptly any [racially] harassing behavior." *Ellerth,* 524 U.S. at 765; *Faragher,* 524 U.S. at 807. The Tenth Circuit has emphasized that reasonableness of the employer's response is a critical element of the *Faragher/Ellerth* defense. *See Holmes v. Utah Dep't of Workforce Servs.*, 483 F.3d 1057, 1069 (10th Cir. 2007) (liability arises only if employer fails to take adequate remedial measures); *Adler*, 144 F.3d at 676 (reasonableness test where stoppage shows effectiveness). Ms. Murley argues that Southeast's claim "that [Southeast's] actions were reasonable even if the harassment did not stop . . . is a question of fact for the jury to decide." Response at 10. But as Southeast notes, "[a] court may

38

determine on summary judgment whether an employer's responses to claims of . . . harassment were reasonable as a matter of law." Reply at 7; *Holmes*, 483 F.3d at 1069 (citing *Scarberry v. ExxonMobil Oil Corp.,* 328 F.3d 1255, 1257 (10th Cir. 2003).

In *Helm v. Kansas*, the Tenth Circuit explained what factors a court should look to in determining reasonableness. *See* 656 F.3d 1277 (2011). First, "courts have recognized that the existence of a valid [anti-] harassment policy is an important consideration in determining whether an employer acted reasonably to prevent . . . harassment." *Id*. at 1288 (citing *Pinkerton*, 563 F.3d at 1062, as well as cases from other circuits). Second, while promulgation of a policy alone may not be enough, when the employer also (1) "distributed its policy to employees . . . , required employees to sign a form affirming that they had read and understood the policies[, and] . . . provided training regarding the [anti-]harassment policy to management-level employees," such efforts are presumptively reasonable. *Helm* at 1288-89.

Southeast points out that it "implemented an anti-harassment policy that prohibits sexual and racial harassment, contains a complaint procedure and lists personnel to whom harassment may be reported." Motion for Summary Judgment at 10. Southeast also "distributed its policy to employees . . . , required employees to sign a form affirming they read and understood the policies . . . , [and] provided training regarding its sexual and racial harassment policies to management level-employees." *Id.* at 10-11. The Court agrees with Southeast that under *Helm*, these actions are reasonably calculated to prevent and correct workplace harassment. *See id.*; *Helm*, 656 F.3d at 1288. Additionally, as Southeast notes, Ms. Murley admits that after Southeast

disciplined Mr. Echavarria, Mr. Echavarria ceased his racial harassment of Ms. Murley.[14] *See*

Motion for Summary Judgment at 11; Murley Depo. at 30:4-19. Indeed, Mr. Echavarria

apparently almost refused to speak with Ms. Murley after his discipline, much less call her *güera*,

tell her she couldn't cook Spanish rice, or do anything else that could have served as the basis for

Ms. Murley's complaint of racial discrimination.[15] *See* Murley Aff. at 1-2. Because, according to

Ms. Murley's own testimony, Mr. Echavarria ceased the harassment of which Ms. Murley had

complained, and Ms. Murley has "produce[d] [no] significantly probative evidence" to the

contrary, the Court can presume that Southeast's disciplining of Mr. Echavarria was effective.

*Bertsch*, 684 F.3d at 1028 (upholding grant of summary judgment on sex discrimination claim

when plaintiff did not show that harassment continued) (citing *Adler*, 144 F.3d at 676) ("stoppage

of harassment by the disciplined perpetrator evidences effectiveness"). Overall, then, Southeast

has shown that its discipline of Mr. Echavarria was reasonable and effective, thereby establishing

the first element of the *Faragher/Ellerth* defense.

### 3. Ms. Murley Unreasonably Delayed Reporting the Harassment to Southeast

The second prong of the *Faragher/Ellerth* defense requires Southeast to show "that the

victimized employee unreasonably delayed in reporting incidents of . . . harassment." *Helm*, 656

---

[14]Though Ms. Murley argues in her Response that "the harassment of the Plaintiff did not stop," the only support for this claim comes from Ms. Murley's statements in her affidavit. *See* Response at 5. The Court ruled above that it would not consider these statements because they conflict with Ms. Murley's clear deposition testimony, showing that they are simply attempts to create a "sham" issue of fact in violation of the Tenth Circuit's guidelines in *Franks v. Nimmo*.

[15]The Court notes again that neither Southeast nor Ms. Murley argued or proved that racial discrimination occurred. Hence, the discussion of whether Southeast properly addressed any such discrimination and whether it continued after Southeast disciplined Mr. Echavarria must assume for the purposes of analyzing the *Faragher/Ellerth* defense that there was discrimination previously.

F.3d at 1291 (citing *Pinkerton*, 563 F.3d at 1063). The Court need not linger over this prong.

Southeast's Policy Handbook sets forth a detailed complaint process that Ms. Murley did not

utilize. *See* Murley Depo. at 221:5-24. Instead, she waited until April 15, 2011 to make a

complaint through her attorney. If the harassment began on February 1, 2011, as claimed in the

EEOC Charge, waiting until April 15, 2011 created a delay of two-and-a-half months. Such a

length of time strikes the Court as unreasonable, if Ms. Murley was concerned about the alleged

racial discrimination. *Cf. Pinkerton*, 563 F.3d at 1063 (holding delay of similar length to be

unreasonable). Ms. Murley signed a form that acknowledged her receipt of Southeast's Policy

Handbook in December, 2009. *See* Handbook Acknowledgment. Ms. Murley may have believed

that "verbally would get it done quicker," but the fact remains that when her verbal complaints to

Ms. Cryer did not result in relief, Ms. Murley did nothing more until April 15, 2011. Murley

Depo. at 47: 13-24, 221:5-11. Furthermore, if Ms. Murley believed that she was still being

discriminated against after April 15, 2011, she now (1) was aware of the possibility of making

written complaints, because of her attorney's letter, and (2) was aware that written complaints

did obtain results, because Southeast disciplined Mr. Echavarria. The Court believes that Ms.

Murley's unreasonable delay in reporting the racial discrimination she felt she was experiencing

before April 15, 2011, and in not reporting any discrimination she may have felt after that date,

supports Southeast's *Faragher/Ellerth* defense on this claim. Therefore, the Court will grant

summary judgment to Southeast on Count I of Ms. Murley's Amended Complaint.

**E.    Southeast's Attempts to Remediate the Hostile Work Environment Were Not
        Clearly Reasonable Under the Circumstances**

Southeast concedes, for the purposes of its Motion for Summary Judgment, that a hostile

work environment existed for Ms. Murley until April 15, 2011, when Ms. Murley's counsel sent

his letter to Southeast. *See* Motion for Summary Judgment at 8-9. Therefore, the Court will not

belabor the legal standard for hostile work environment claims. Important principles underlying

such claims, however, are relevant here. First, Title VII is not "a general civility code" for the

workplace. *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81 (1998); *accord Dick v.*

*Phone Directories Co.,* 397 F.3d 1256, 1263 (10th Cir. 2005). "Accordingly, the run-of-the-mill

boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the

stuff of a Title VII hostile work environment claim." *Morris v. City of Colorado Springs*, 666

F.3d 654, 663-65 (10th Cir. 2012) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788

(1998) and cases from other circuits).

      "To survive summary judgment on a claim alleging a racially hostile work environment,

the plaintiff must show that a rational jury could find that the workplace is permeated with

discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter

the conditions of the victim's employment and create an abusive working environment, and that

the victim 'was targeted for harassment because of [her] race or national origin.'" *Hernandez*,

684 F.3d at 957 (quoting *Morris*, 666 F.3d at 663-64) (brackets and internal quotation marks

omitted). The Tenth Circuit has noted that "the severity and pervasiveness evaluation [portion of

hostile work environment analysis] is particularly unsuited for summary judgment because it is

quintessentially a question of fact." *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir.

2007) (quoting *McCowan v. All Star Maint., Inc.,* 273 F.3d 917, 923 (10th Cir. 2001). However,

because in this case Southeast concedes that a hostile work environment existed before April 15,

2011, the Court need not hesitate over whether any fact issues exist as to the severity and

pervasiveness of the harassment Ms. Murley alleges.

      As with Ms. Murley's racial discrimination claim, Southeast asserts the *Faragher/Ellerth*

defense to her hostile work environment claim. The Court need not re-assess whether Southeast

is entitled to assert the defense in the first place—that is, having established above that no

official action was the basis for Ms. Murley's constructive discharge, the Court can go directly to

an assessment of whether Southeast meets the defense's requirements. However, the Court's task

on this count is complicated by Ms. Murley's claim that Mr. Echavarria threatened twice to kill

her, while brandishing a knife. Southeast argues that the Court should not consider these

incidents in its evaluation of Southeast's response to Ms. Murley's complaints of harassment,

because Ms. Murley's attorney did not mention them in his letter of April 15, 2011, and because

Ms. Murley failed to mention them in her EEOC Charge. *See* Reply at 9. Southeast says that it

cannot be held responsible for remediating harassments of which it was unaware, implying that

because Ms. Murley's attorney's letter did not mention the threats, Southeast did not know of

them. However, this is clearly untrue: in Southeast's CAD for Mr. Echavarria, specific reference

is made to him having threatened to kill Ms. Murley (though not mentioning a knife). *See*

Echavarria CAD. Therefore, Southeast must have learned of the threats in its investigation of

Mr. Echavarria after the April 15, 2011 letter, if it did not know of them before.

　　　　The Court agrees with Ms. Murley that threats like these are obviously more serious than

some other kinds of harassment, and require the employer to deal with them in a serious manner.

When an employee, who already feels that her supervisor is harassing her, is threatened with

death by that same supervisor as he wields a knife, the phrase "hostile work environment" hardly

begins to describe the situation. Mr. Echavarria may not have actually intended to harm Ms.

Murley, but his intent is irrelevant. But, considering that Mr. Echavarria also called Ms. Murley

racially hostile names like *güera* and *burra*, and demeaned her cooking compared to Southeast's

Mexican cooks, the Court believes that the knife threats may have taken on added significance

for Ms. Murley, who is non-Hispanic. The result of Mr. Echavarria's threats was, in any case, to scare Ms. Murley enough that she asked her husband to visit her workplace to see what was happening. She continued to be so afraid of Mr. Echavarria that even his silent glaring at her caused her to feel threatened.

It is true that Ms. Murley acknowledged that Mr. Echavarria's harassment of her, in terms of both slurs and knife threats, stopped after her attorney sent a letter complaining about Mr. Echavarria's discriminatory behavior to Southeast and Southeast disciplined Mr. Echavarria. After this, as noted, Southeast placed Mr. Echavarria on unpaid leave and required him to take video training in multiple areas including "workplace violence." Echavarria PIP at 2.But the Court is not convinced that, as a matter of law, this level of discipline meets the standard for reasonableness required by the *Faragher/Ellerth* defense. While " '[a] stoppage of harassment' *suggests* a reasonable employer response," such a stoppage does not mean that the response is *definitively* reasonable. *Benavides v. City of Oklahoma City*, 12-6107, 2013 WL 238861 (10th Cir. Jan. 23, 2013) (quoting *Tademy*, 614 F.3d at 1148) (emphasis added). An employer "is entitled to judgment as a matter of law under the *Faragher/[Ellerth]* affirmative defense 'only if the evidence points but one way and is susceptible to no reasonable inferences supporting' the opposing party." *Mallinson–Montague v. Pocrnick*, 224 F.3d 1224, 1228 (10th Cir. 2000) (quoting *Mason v. Okla. Turnpike Auth.*, 115 F.3d 1442, 1450 (10th Cir. 1997)). In this case, as elaborated below, the Court believes reasonable inferences could support Ms. Murley's position that Southeast did not adequately respond to Mr. Echavarria's threats.

When the Tenth Circuit adopted the "reasonable response" approach for the *Faragher/ Ellerth* defense, it also noted that "[i]n cases where effectiveness is not readily evidenced by a stoppage, we consider the timeliness of the plaintiff's complaint, whether the employer unduly

delayed, and whether the response was proportional to the seriousness and frequency of the

harassment." *Adler*, 144 F.3d at 676 (citing, e.g., *Knabe v. The Boury Corp.*, 114 F.3d 407, 414

(3d Cir. 1997); *Saxton v. AT & T Co.*, 10 F.3d 526, 535 (7th Cir. 1993)). Ms. Murley may not

have submitted a timely written complaint to Southeast about Mr. Echavarria's knife threats, but

the reaction Ms. Murley reports hearing from Ms. Cryer—i.e., laughing and saying "maybe [Ms.

Cryer] should get boxing gloves for [Ms. Murley and Mr. Echavarria]—indicate that Ms. Murley

may have told Ms. Cryer about the knife threats.[16] *See* Murley Aff. at 1. The Court believes that

in this case, the severity factor under the applicable test outweighs the timely reporting and undue

delay factors. Ms. Murley plainly felt that she was in a hostile work environment; Southeast has

conceded, for the purposes of the Motion for Summary Judgment, that such an environment

existed. But when Mr. Echavarria made threats to kill Ms. Murley while brandishing a knife,

Southeast administered no more discipline than video training on workplace violence, three days

of unpaid leave, and a Performance Improvement Plan, before returning Mr. Echavarria to the

same kitchen with Ms. Murley, with ready access to knives. Even Mr. Echavarria's CAD, which

lists his threats against Ms. Murley as though they are of the same kind and severity as his name-

calling—all grouped together under the heading of "inappropriate verbal communication used in

reference to an employee under your supervision"—suggests that Southeast did not take the

situation very seriously when it was disciplining Mr. Echavarria. Echavarria CAD. Whether

Southeast's response was "proportional to the seriousness . . . of the harassment" is a factual

---

[16]Ms. Murley's affidavit does not clearly state what behavior she reported to Ms. Cryer.
She merely states, after listing offensive behavior by Mr. Echavarria including the knife threats,
that "I contacted Ms. Cryer and she would do nothing but laugh about it and at one point said,
maybe she should get boxing gloves for me and Robert." Murley Aff. at 1. However, if the Court
takes this factual statement in the light most favorable to Ms. Murley, the implication is that Ms.
Murley did report the knife threats to Ms. Cryer.

question that a jury must answer. *Adler*, 144 F.3d at 676.

The Court does not necessarily agree with Ms. Murley that "[t]he *only* reasonable response to the conduct by Robert Echavarria was for him to be terminated and to keep him completely away from this Plaintiff." Response at 10 (emphasis added). But while the Court does agree with Southeast's statement that "the law encourages the employer to progressively discipline the employee . . . to determine if the harasser can or will change," the Court notes that Southeast could have taken other incremental measures, short of terminating Mr. Echavarria, that may have been more appropriate in these circumstances. Reply at 8. It would be inappropriate to risk seeing "if the harasser can or will change" by observing subsequent behavior, when the prior behavior is as severe as Ms. Murley alleges. *Id.* If Mr. Echavarria did not change, and made the same threat with a knife again, one false move, slip, or impulse could too easily have led to tragedy. This possibility, albeit remote, explains the Court's different approach to assessing the reasonableness of Southeast's response to Ms. Murley's hostile work environment claim as opposed to its response to her discrimination claim, though the two are linked. Southeast's mild, incremental response to Mr. Echavarria's discriminatory comments was sensible; had he continued with similar racially disparaging comments, Southeast could have disciplined him more severely, and although Ms. Murley's feelings may have been hurt by the continued comments, she would not have been physically harmed. The situation is very different with the knife threats and the possible, although unlikely, extreme outcomes related to such serious behavior.

In sum, the Court believes that Southeast's decision to allow Mr. Echavarria to continue working with Ms. Murley in the same kitchen—an environment with easy access to knives— after learning of Ms. Murley's allegations about his knife threats, precludes a conclusion that Southeast has established the first prong of its *Faragher/Ellerth* defense as a matter of law. This

46

is a question of fact for determination by a jury.[17] Because Southeast has not met the defense's

first prong, the Court need not discuss the second *Faragher/Ellerth* prong, evaluating whether

the employee unreasonably delayed reporting. Therefore, the Court will deny Southeast's

Motion for Summary Judgment on Ms. Murley's hostile work environment claim.

**IT IS ORDERED THAT**:

(1) DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 33) IS

  GRANTED AS TO PLAINTIFF'S CLAIMS OF SEX DISCRIMINATION IN

  COUNTS I, II, AND III OF THE FIRST AMENDED COMPLAINT (Doc. No.

  4), AND THOSE CLAIMS WILL BE DISMISSED WITHOUT PREJUDICE.

(2) DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 33) IS

  GRANTED AS TO PLAINTIFF'S CLAIM OF CONSTRUCTIVE DISCHARGE

  IN COUNT V OF THE FIRST AMENDED COMPLAINT (Doc. No. 4), AND

  THAT CLAIM WILL BE DISMISSED WITHOUT PREJUDICE.

(3) DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 33) IS

  GRANTED AS TO PLAINTIFF'S CLAIMS OF DISCRIMINATION (RACE),

  DISPARATE TREATMENT (RACE), AND RETALIATION IN COUNTS I, II,

  AND III OF THE FIRST AMENDED COMPLAINT (Doc. No. 4), AND THOSE

  CLAIMS WILL BE DISMISSED WITH PREJUDICE.

---

[17]The parties' imprecise briefing, which provided only muddled descriptions of events and few details as to when they occurred, did not provide the Court with much assistance; as a result, the Court had difficulty reaching this decision and believes it is a close question.

(4)    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 33) IS

DENIED AS TO PLAINTIFF'S CLAIM OF HOSTILE WORK

ENVIRONMENT (RACE) IN COUNT II OF THE FIRST AMENDED

COMPLAINT (Doc. No. 4).


_____

SENIOR UNITED STATES DISTRICT JUDGE

48